Filed 12/4/25  P. v. Owens CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAMIEN OWENS,<br><br>    Defendant and Appellant. | E083675<br><br>(Super.Ct.No. INF039223)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

Jazmyne D. Alverson, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Damien Owens appeals the superior court's denial of his petition for resentencing under Penal Code[1] former section 1170.95, now renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10.) Following an evidentiary hearing, the court concluded defendant could be convicted of first degree murder under current law because he was a major participant in the robbery who acted with reckless indifference to human life. (See §§ 189, subds. (a) & (e)(3), 1172.6, subd. (a)(3).) Defendant contends the court erred by not distinguishing between the "major participation" factors of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and refusing to consider the "reckless disregard" factors of *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. The Shooting

About 2:00 a.m. on December 19, 2001, Officer Denney of the Desert Hot Springs Police Department saw a midsize, four-door white car with its parking lights on parked in front of an apartment complex at Second and Mesquite. In the car were a female driver, Shalamar Wiley, and a male passenger, codefendant Rayshawn Lamarr Session. Denney told them it would be a good idea to leave, because they were parked in front of a known "crack house." (*Owens*, *supra*, E033148.)

---

[1] Further unspecified statutory references are to the Penal Code.

[2] On our own motion, we take judicial notice of the nonpublished opinion in *People v. Owens et al.* (Apr. 12, 2005, E033148) (*Owens*), from defendant's appeal from the judgment. (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).) We repeat our prior opinion's factual and procedural background.

Russell Wilson (the victim) lived in a one-bedroom, one-bathroom apartment in the complex at Second and Mesquite with his girlfriend Faye Ransom, her mother Catherine Daniels, Ransom's niece Sophia Lindsey, and Ransom's friend Angela Rippy. Sophia Lindsey's mother, Mary Lindsey, was also at the apartment on the morning of December 19, 2001. (*Owens*, *supra*, E033148.)

Sometime after midnight that morning, defendant came to the apartment with codefendant Clayton Walton. Ransom was in the bedroom watching television while the victim was sleeping in the bed. Ransom and her mother had known defendant for several years and considered him a friend. While defendant and Walton were visiting in the living room, there was a knock at the front door of the apartment. Sophia Lindsey answered the door and told defendant, "Your friend wants you." Defendant went out briefly and returned; Walton stayed inside. Later, there was another knock, and Sophia Lindsey told defendant his friend wanted him again. Defendant went out for a little longer than the first time and returned. Walton stayed in the apartment while defendant was gone. (*Owens*, *supra*, E033148.)

Defendant went into the kitchen and got a plastic trash bag. Either defendant or Walton asked if Walton could use the bathroom. Ransom agreed. The bathroom was accessible only through the bedroom, so Walton went through the bedroom, where the victim and Ransom were, and into the bathroom. However, he was only there for a short time and did not flush the toilet. He returned to the living room and conversed with defendant. (*Owens*, *supra*, E033148.)

3

Rippy was in the kitchen smoking "crack." She heard the dogs barking at the front door. As she opened the door to let them in, two men walked in and went toward the bedroom. When Ransom heard the front door of the apartment open, she told Sophia Lindsey to lock the door and not open it anymore. Then she got up and locked the door herself. As she started back to the bedroom, she saw Session standing by the bedroom door and Walton sitting on the loveseat. Ransom had not seen Session before. (*Owens*, *supra*, E033148.)

Ransom went into the bedroom and tried to close the door, but Session came in, grabbed her by the back of her head, and stuck a handgun to her head. He said, "Bitch, shut up, don't say nothing. [G]ive me the money, and give me the dope." He shoved her down on the bed, and she told him that she did not have any money and there was no dope there. He again said, "Bitch, give me the money or the dope or I'll blow your fucking head off." He jammed the gun in her head again and tried to throw a sheet over her face; however, she was still able to see what was going on. Walton was in the bedroom while these events were occurring. Ransom could feel the victim, who was still in the bed, try to turn over. When this happened, Session said, "Fuck that, son of a bitch, fuck you," and shot the victim in the chest. (*Owens*, *supra*, E033148.)

Defendant at that time was in the living room with Rippy, Daniels, Mary, and Sophia Lindsey. Either before or after the shot, defendant told the others not to "trip" and that he and his companions were just there to collect a debt that had been owed for a long

4

time. Wearing gloves, defendant unrolled a plastic trash bag and started undoing the DVD player from the television. He put the player in the bag. (*Owens*, *supra*, E033148.)

After shooting the victim, Session said to Walton, "Man, look, that mother fucker's got on gold, take those fuckin' rings off his hands, get those rings." Walton took four rings off the victim's fingers and went over to the PlayStation and yanked the wires off. He said, "[T]hat mother fucker, fuck this, I'm taking this shit," and he took the PlayStation. Both codefendants left the room. (*Owens*, *supra*, E033148.)

Rippy and Sophia Lindsey were in the living room when the codefendants came out of the bedroom. Session stuck the gun in Lindsey's face and told her and Rippy to get down on the floor. After getting down, Rippy looked up, and Session swung around, pointed the gun at her, and said, "Bitch, I'll blow you away," and "I said get your head down, bitch, before I blow your mother fucking brains out." Defendant, Session, and Walton left the apartment together. Ransom went outside and saw a little white car with defendant and two or three other people driving away. The victim died of a gunshot wound to the chest. (*Owens*, *supra*, E033148.)

B. *The Extrajudicial Statements*

Following their arrests, defendant, Walton, and Session voluntarily spoke to district attorney investigators about the facts of the crimes. Investigator McDonagh testified about the contents of the statements, and a recording of Session's statement was played for the jury. (*Owens*, *supra*, E033148.)

5

## 1. Defendant

Defendant was interviewed in the evening on December 19, 2001, and shortly after midnight the following morning. He stated he had gone to the victim's home the morning of December 19 to make some money. The idea was to rob the victim, because he would not report the crime to the police. Defendant admitted he took the DVD player. He also admitted telling Sophia Lindsey outside the apartment that the victim was going to get "jacked." None of defendant's statements were played before the jury, and he did not take the stand. (*Owens*, *supra*, E033148.)

## 2. Session

Session stated that hours before the shooting, he was at the home of his friend Wiley. At some point, he and Wiley drove to Walton's house in Wiley's car, which was white. When they arrived, Walton and defendant were standing outside. Session had known the two for several years. Defendant was trying to sell drugs but was not having very good luck. Defendant said they needed to make some money, and he knew of an opportunity to get about $500 cash and a couple of ounces of dope from a man who owed him some money. He said they could do it that night, but they did not have a ride. Session said Wiley could give them a ride. Walton was listening and said it sounded like a good idea. (*Owens*, *supra*, E033148.)

Later that day, Session asked Wiley to give him, defendant, and Walton a ride to Desert Hot Springs so they could do some business. She agreed. Session told the others

6

not to say anything around Wiley about what they were going to do, or she would not give them a ride. (*Owens*, *supra*, E033148.)

Having been at the victim's apartment before, defendant told his codefendants who would be there. He said that he and Walton would go in first to see who had the money and how much there was. He also said he would bring a gun, put it under the car seat, and Session should carry it because he (defendant) could not carry the gun when he went into the apartment. (*Owens*, *supra*, E033148.) Upon arriving at the apartment complex, defendant and Walton got out of the car while Session and Wiley waited. (*Owens*, *supra*, E033148.)

After an hour or two, Session got tired of waiting. He went to the apartment and knocked. Defendant answered the door, along with a lady Session did not know. Defendant said he would come outside and talk to Session in a few minutes. (*Owens*, *supra*, E033148.)

Later, defendant came out and said, "Lets [*sic*] go up in here and get my money." Session said, "[A]ll right lets [*sic*] go." He grabbed the gun and entered the apartment with defendant. Walton was sitting on the couch. Defendant told Session to go into the bedroom while he (defendant) stayed in the living room to make sure the girls did not go anywhere. (*Owens*, *supra*, E033148.)

Session went into the bedroom and saw the lady (who had come to the door earlier) watching television. He had the gun at his side and said to her, "Where's you're [*sic*] all money and dope bag." The lady said, ". . . I don't have it. He has everything."

She got off the bed, and Session pushed her out of the way so he could get to the victim's side of the bed. Walton walked into the room. The victim was still sleeping. Walton told Session to wake him up. Session nudged the victim, and he woke up and saw the gun. His reaction caused Session to put up his hand, and the gun went off. Session said, "[L]ets [*sic*] just leave" and walked out of the apartment. (*Owens*, *supra*, E033148.)

Session got in the car with Wiley, and a few seconds later, defendant and Walton jumped in with "all the stuff" in their hands. Session told Wiley to drive away. He said, ". . . I think I shot him, I think I killed him." He told Wiley to park near a house so he could dispose of the gun; he left it in a flowerpot. Wiley dropped Session off at his girlfriend's sister's house. (*Owens*, *supra*, E033148.)

Session stated he and the others only went to the apartment to rob the victim. Asked why, in that case, he took the gun with him, he explained, "Well, what do you rob somebody with . . . ." After making his recorded statement, he led the investigators to the gun. (*Owens*, *supra*, E033148.)

*3. Walton*

Walton was interviewed in January 2002, in the presence of his attorney and a defense investigator. He said he had gone to the apartment complex on December 19, 2001, and was in the car when the police officer contacted Wiley and Session in front of the complex, but he bent down and was out of the view of the officer. After the officer left, he went inside the apartment to use the bathroom located in the bedroom. He left the apartment and went back outside to the front of the complex. He denied removing any

8

property from the apartment and denied being in the apartment when the victim was shot. (*Owens*, *supra*, E033148.)

### C. Session's Trial Testimony

At trial, Session testified he went to the apartment complex on December 19, 2001, with Wiley, defendant, and Walton to sell some drugs. Wiley did not want to go inside, so he stayed with her in the car. Session, Walton, and defendant were supposed to take turns sitting in the car with her. Defendant brought a gun along and put it behind the car seat. (*Owens*, *supra*, E033148.)

After an hour and a half, defendant and Walton had not returned, so Session went to the door of the apartment and asked them whether they wanted to switch places. They declined, so Session went back to the car. He went to the apartment door a second time but returned to the car. The third time he went to the apartment door, he went inside, sat down, and talked to defendant. Walton was sitting and smoking a cigarette. Session had never seen any of the other people in the apartment before. (*Owens*, *supra*, E033148.)

After a while, Session heard an argument going on in the bedroom. He looked in the bedroom and saw Ransom standing inside arguing with a man Session did not recognize. The victim was lying in the bed. The man who had been arguing with Ransom came out of the room and asked if anyone had a gun. Session had brought the gun from the car for protection, because the apartment was a dope house. The man asked to use the gun, so Session gave it to him. The man put it in his waistband and walked back into the bedroom. He told Ransom that since they did not have his money, he was

going to take the DVD player and PlayStation as collateral. He told Sophia Lindsey to get him a bag to put the stuff in. Ransom woke the victim up to tell him the man was taking the stuff. The victim and the man started arguing. The man tried to hit the victim with the gun, but the victim moved out of the way, and the gun bounced off the bed and went off. (*Owens*, *supra*, E033148.)

Session asked the man why he shot the victim. The man said it was an accident. Session took the gun back and started walking out the door. The man unhooked the PlayStation and went out of the bedroom. Session suggested he and defendant leave. Defendant took the DVD player, and defendant, Session and Walton left the apartment. The man who had shot the victim left right after that. Session thought the name of the man who shot the victim was Bam, but he was not sure. (*Owens*, *supra*, E033148.)

Session disposed of the gun because he was afraid of getting pulled over and caught with it when it had been used to kill the victim. He further testified that his extrajudicial statement to the police was not truthful. He made the statement because the investigator said they knew he did it, and if he confessed and said the killing was an accident, he would get voluntary manslaughter. Before Session made the statement, the investigator went over the whole case with him. Based on what the investigator told him, he made the statement. (*Owens*, *supra*, E033148.)

According to Session, when he and the others went to the apartment complex on December 19, 2001, Walton did not know what the plan was. On May 6, 2002, Session sent a letter to Walton's mother stating Walton had nothing to do with what happened.

10

The letter also stated that when Session gave the gun to the man who shot the victim, he did not know the man was going to shoot, because all the man said was that he was going to scare the victim because he owed the man money. On June 28, 2002, Session wrote to Walton's attorney, stating that although Walton was inside the apartment at one point, he was not there when the crime took place and did not have any knowledge of what happened in the apartment. (*Owens*, *supra*, E033148.)

After Session testified, Investigator McDonagh testified he did not offer or give Session anything in return for his extrajudicial statement. According to McDonagh, the question whether he could assist Session in any way never came up. (*Owens*, *supra*, E033148.)

*D. The Verdict and Sentence*

On September 11, 2002, the jury convicted defendant of first degree murder with robbery and burglary felony-murder special circumstances (§§ 187, 190.2, subd. (a)(1) & (17)(G)), first degree residential robbery (§§ 211, 212.5), and first degree residential burglary (§ 459), and found that a principal was armed in the commission of the offenses (§ 12022, subd. (a)(1)). (*Owens*, *supra*, E033148.) He was sentenced to life without the possibility of parole for the felony-murder conviction, plus one year for the arming enhancement, six years for the robbery conviction (stayed under § 654), and one year four months for the burglary conviction (stayed under § 654). We affirmed his convictions. (*Owens*, *supra*, E033148.)

11

*E. Petition for Resentencing*

After Senate Bill No. 1437 came into effect, defendant petitioned the superior court for resentencing under section 1172.6. Following an evidentiary hearing, the court denied the petition, finding that defendant was a major participant and acted with reckless indifference to human life as evidenced by the facts that he set up the robbery, provided the gun, and was not surprised when Session used the gun to kill the victim.

## II. DISCUSSION

Conceding that he was a major participant in the robbery, defendant contends the superior court "ignored his pleas to review his state of mind pursuant to *Clark*, merely referencing its overlap with *Banks*." He argues there is a "clear distinction between the factors in *Banks*, which analyzes [his] participation in the underlying felony, and the factors in *Clark*, which analyzes [his] mens rea." He faults the court for using Session's actions to implicate him in the murder without considering his "delay, his cohort running out of patience," his "warning to other people at the apartment," or his "attempt to de-escalate the risk of violence."

*A. Applicable Legal Principles*

"Section 189, subdivision (e), which permits a felony-murder conviction only when specified facts relating to the defendant's individual culpability have been proved, incorporates in subdivision (e)(3) the same requirements for proving the defendant acted with reckless indifference to human life as a major participant in one of the identified serious felonies as necessary for a felony-murder special-circumstance finding under

12

section 190.2, subdivision (d).[3] The factors properly considered in assessing such a felony-murder special-circumstance finding were clarified in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, [more than one decade after defendant's] conviction. [Citation.]" (*People v. Harris* (2021) 60 Cal.App.5th 939, 954.)

As relevant to the case before this court, the California Supreme Court recently reviewed the history behind the major participant and reckless indifference concepts and interpreted the reckless indifference standard: "In brief, the major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions—*Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*)—that articulate the constitutional limits of capital punishment for accomplices to felony murder. [Citation.] In *Enmund*, the high court held that a minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. [Citations.] A few years later, the high court revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the

---

**3** "Enacted in 1990, section 190.2, subdivision (d), provides that 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4.' [Citation.]"

13

victims in the remote desert after the escapees shot them.  [Citation.]  The court held that 'major participation in the felony committed, combined with reckless indifference to human life,' provides a sufficient degree of culpability to be eligible for a sentence of death.  [Citation.]  Section 190.2, subdivision (d), . . . was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*.  [Citation.]  Section 190.2, subdivision (d), by its text, imposes an actus reus requirement, i.e., major participation in the enumerated felony, and a mens rea requirement, i.e., reckless indifference to human life.  [Citation.]

"Thereafter, in our own pair of cases—*Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522—this court endeavored to elucidate the contours of the major participant and reckless indifference standards.  [Citation.]  'Because the language derived from United States Supreme Court felony-murder precedent, we looked to that case law for guideposts.'  [Citation.]  We observed that *Enmund* and *Tison* 'collectively place conduct on a spectrum' of culpability, 'with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions.'  [Citation.]  We cautioned that, though the conduct of the defendants in *Enmund* and *Tison* mark opposite ends of the spectrum for 'nonkiller felony murderers,' Enmund's actions do not represent 'the outer limit of conduct immune from death eligibility,' any more than the Tisons' actions represent the 'constitutional minimum level of culpability for death eligibility.'  [Citation.]

"To guide the 'fact-intensive, individualized inquiry' into where a defendant's conduct falls on the spectrum of culpability [citations], in *Banks* we identified a list of considerations relevant to the major participant prong. [Citation.] Similarly, in *Clark* we identified a list of considerations relevant to the reckless indifference prong. [Citations.] In amending section 189, which governs murder liability generally, Senate Bill No. 1437 imported the actus reus and mens rea requirements from the special circumstance statute. 'It is undisputed that when Senate Bill [No.] 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*.' [Citation.] We are therefore guided . . . by our pronouncements in *Banks* and *Clark*, and our application of their requirements in [*In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*)].

"As set forth by the United States Supreme Court, '[r]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death."' [Citation.] 'Examples include "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property."' [Citation.] Although the high court's examples describe actual killers, not accomplices to felony murder, we explained they nonetheless 'provide some indication of the high court's view of "reckless indifference" . . . .' [Citation.] Namely, reckless indifference to human life 'encompasses a willingness to kill (or to assist another in killing) to achieve a

15

distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation.]

"After extrapolating these animating principles from *Tison*, we went on to explain that reckless indifference encompasses both subjective and objective elements. [Citation.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create."' [Citations.] 'As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" [Citation.]

"'The degree of risk to human life is crucial to the analysis.' [Citation.] As the United States Supreme Court has acknowledged, "'the possibility of bloodshed is inherent in the commission of any violent felony,"' such that one who perpetrates or attempts to perpetrate such a crime may well anticipate 'the use of lethal force as a possibility.' [Citation.] Were that degree of culpability sufficient, however, it would amount to "'little more than a restatement'" of the former felony-murder rule that Senate Bill No. 1437 retired. [Citation.] "'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory

requirement.' [Citation.] This Court has thus made clear that participation in a '"garden-variety armed robbery,"' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference. [Citations.]

"To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, *Clark* 'set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' [Citation.] '"[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient."' [Citation.] The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference. [Citation.]" (*People v. Emanuel* (2025) 17 Cal.5th 867, 882-885, fns. omitted (*Emanuel*).)

C. *Analysis*

Here, the question is whether the superior court applied the reckless indifference standard as articulated in *Clark*. To answer this question, we are mindful of *Clark'*s list of considerations, and that reckless indifference encompasses both subjective and objective elements. Accordingly, for us to conclude that the court did not fail to consider the *Clark* factors separately and apart from the *Banks* factors, the record must show that it contemplated these questions: Was defendant aware of the presence of a weapon? Did

17

he know his codefendant was likely to use force?  Was he physically present at the scene?  Did he have an opportunity to minimize the overall risk of violence, restrain his codefendant, or aid the victim?  What was the duration of the crime?  Did he consciously disregard the significant risk of death his actions created?  Did he """"knowingly creat[e] a 'grave risk of death.'"""  (*Emanuel*, *supra*, 17 Cal.5th at p. 884.)  We are mindful that """"[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient,""" and "[t]he 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference.  [Citation.]"  (*Id.* at p. 885, fn. omitted.)

Judge John D. Molloy presided over the hearing on defendant's petition for resentencing.  He read through the entire transcript of the trial and concluded that defendant was not the actual slayer.  Thus, he stated that defendant's "liability for murder rises or falls on aider and abettor liability under felony murder rule, and whether he was a major participant acting with a reckless disregard."  The judge summarized the witnesses' testimonies and the relevant law, including *Banks*, *Enmund*, and *Tison*.  He acknowledged that felony-murder special circumstance (§ 190.2) imposes "both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life."  The judge found defendant to be a major participant based on the facts that he gained access to the house for his codefendants, told everyone not to worry when they heard the gunshot, explained to them that this is about a debt that

18

is owed, and then opened a trash bag and began to remove property. Defendant does not dispute this finding.

Turning to the reckless disregard element, Judge Molloy looked to the "teachings of *Banks*" and considered the relevant factors. First, he found that defendant was "the one who set everyone up" and thus played a significant role in planning the robbery that led to the victim's death. Defendant challenged the judge's finding that defendant knew what was going on in the bedroom after the shot, "like it was like a part of the robbery." More specifically, he claimed the testimony shows that he made the statement, "Don't worry. This is about a debt that was owed," (herein "the statement") and started unhooking the DVD player prior to the shot. Judge Molloy referenced two witnesses' testimonies regarding the sequence of events, stating that "both of them indicate that even after that, whether it was a statement first, shots second, or shot first, statement second, that immediately after that, your response was to open the trash bag that you had requested ahead of time and start putting the DVD in there." Following further discussion, the judge stated he would "go back and look at it a second time."

Second, regarding defendant's awareness of "the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants," Judge Molloy stated, "I have no idea what your experience with the other participants was before this. There was nothing brought into evidence other than you've all been friends a while. You know each other. Nobody, not Session, none of the statements contributed to Walton, none of the statements by any of the other witnesses tell me what

19

you know about them. [¶] The only thing I know about is, if we believe what Session said to [Investigator] McDonagh, that the gun was yours and that you had supplied it." Acknowledging that Session was not a very credible witness, the judge noted that, "what he testified to was completely consistent with how Mary [Lindsey] and [Angela] Rippy characterized events."

Third, Judge Molloy answered, "Yes," to the question, "Was the defendant present at the scene of the killing?"

Fourth, Judge Molloy asked, "Was [defendant] in a position to facilitate or prevent the actual murder?" In response, the judge stated, "If we talk about the bedroom, the answer is no. If we talk about the apartment in general, the answer will be yes."

Fifth, in response to the question, "[D]id [defendant's] own actions or inactions play a particular role in the death?" Judge Molloy stated, "Tougher to say. It appeared that at the time the gun went off, you were on the couch—or the loveseat."

Finally, Judge Molloy asked, "What did the defendant do after lethal force was used?" The judge commented, "I read the testimony different than what you're suggesting.· It suggests that you began taking the property after the gunshot went off. That is one of the things that I get to consider. When I look at that—when I look at that, what I see is a person—[¶] . . . [¶]—who acted in reckless disregard." Defendant again asserted the sequence of events, the statement, and unhooking the DVD, happened prior to the shot. The judge replied, "I'll take a second look."

Following a short break, Judge Molloy informed the parties that he "went back over all of Miss Rippy's testimony and all of Miss Daniel's testimony," and then he read the portions of their testimonies that covered "the sequencing in terms of what happened with the gunshot, and the comments." After reading the testimonies, the judge noted that Miss Rippy testified on direct that it was "shot, [the statement], stuff taken off," but then on cross-examination said that the shot was after the statement and unhooking the DVD. However, Miss Daniels was clear about the sequence of events. Judge Molloy chose to believe Miss Daniels's testimony because Miss Rippy had been smoking crack in the kitchen, while there is no evidence that Miss Daniels was on crack cocaine or disoriented.

The judge then stated, "When I make judgment calls, I've got to make it based on what I have before me. I read all of this. I did. It looks like you set this up. And I'm being honest it looks like when the shot—to me, based on what I reviewed from the witnesses, it looks like when the shot got off, you went, Hey, guys. Hey, this isn't about you. This tells me you knew what was going down. I'm just being man to man straight from what I read. It looks like you knew what was coming. [¶] When it happened, it wasn't a surprise. And you continued taking property, which is the type of things that I'm supposed to consider under *People v. Banks*.· It looks like you're good for it to me."

When defendant asked if the judge's finding was "like intent to kill," Judge Molloy responded, "No. It's not. It is not an intent to kill. It is different. [¶] . . . [¶] . . . I told you, the facts are not sufficient from which I could even come close to determine that you had a specific intent to kill in the bedroom." Rather the judge found

21

defendant to be a major participant acting with reckless indifference. He reiterated his thoughts on determining whether defendant acted with reckless indifference as follows: "I get to consider what you did before and what you did after.

"I'm a little bit hesitant to accept what Session said to [Investigator] McDonagh, but I can tell you this, everything he said to McDonagh checked out. Everything he said to McDonagh checked out. I was the shooter. I know where the gun is. He took him right to the gun. It happened in the bedroom. That's where it went down. He was shot in the chest. That's where he was shot. [¶] . . . [¶] . . . Walton and [defendant] were already in the house. Every witness agrees upon that.

"One of the things he also says is it was your gun, and you provided it, and you gave it to him. It would be easy for me to conclude that he did, in fact, do that. In which case, you're the one inserting or bringing along the deadly force.

"I thought about that for a bit, and thought, I'm going to do this two ways before I have to make that final credibility judgment as to Session because, like I said, he was all over the place.

"I said to myself, well, what if he didn't? What if I don't conclude that I believe [defendant] is the guy that brought the gun to the party? So I went back and looked at what actions you did. And what I was very curious about is what we've been talking about. What happened right before the gun went off, and what happened right after the gun went off because you were there.

"And when I look at this, it looks like—to me, it looks like you were not surprised. It looks like you knew that that was something that was going down, and you continued to steal afterwards. When I look at that, that is heart and soul of what reckless indifference—of what major participant acting with reckless indifference looks like. It is. And it's something between the Tisons, who were blood-thirsty folks, and Mr. Enmund, who was just the getaway driver.

"And just so you know—and you may have been here the day it happened. There was a case in this department where I found somebody not guilty who just happened to be there. He happened to be there. He was a third member of three gang members. And he was there. He never threw a punch. Nobody ever attributed a single comment to him. And this other guy, who had come back with a gun, got out, and opened up on the crowd. That's what the legislature was after.

"But that's not you. You were the one that set it up, and you were there. And what you did immediately following the gunshot, that I believe has been demonstrated beyond a reasonable doubt, after the gunshot convinces me beyond a reasonable doubt that the People have proved that you were a major participant acting with a reckless disregard. And that's the reason for my ruling."

Defendant asked, "Is it the Court's position that you're not going to even consider the *Clark* factors, you're just going all on *Banks*?" Judge Molloy replied, "*Clark* factors and *Banks* factors are no different, they are just different ways of articulating the same thing." The judge then reiterated the relevant factors and found the most damning one to

be what defendant did after lethal force was used: "I believe that the force of the evidence suggests that after lethal force was used, he told everyone to relax, which suggests to me that he knew lethal force was going to be used, and he continued to steal."

Contrary to defendant's assertion, the record shows the superior court considered all the *Clark* factors except for one, the duration of the crime. However, as we have previously observed, """[n]o one of these [factors] is necessary, nor is any one of them necessarily sufficient,"" and "[t]he 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference. [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. omitted.) Even without consideration of the duration of the crime, the remaining factors considered by the court support its finding.

### III.  DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
_____
Acting P. J.

We concur:

FIELDS _____
J.

MENETREZ _____
J.

24